IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | |
|---|---|
| Brittany Skeans, as mother and next friend of M.S., a minor, and Shane Skeans, <br><br> Plaintiffs, <br><br> v. <br><br> Atlantic Marine Corps Communities, LLC, d/b/a Atlantic Marine Corps Communities at Tri-Command, f/k/a Tri-Command Managing Member, LLC, a/f/k/a Tri-Command Military Housing, LLC, and Atlantic Marine Corps Communities Property Management LLC, <br><br> Defendants. | 9:24-cv-03049-RMG <br><br><br><br> **COMPLAINT** <br> ***(JURY TRIAL DEMANDED)*** |

Plaintiffs, Brittany Skeans, as mother and next friend of M.S., a minor, and Shane Skeans, (collectively "Plaintiffs") complaining of Defendants Atlantic Marine Corps Communities, LLC, d/b/a Atlantic Marine Corps Communities at Tri-Command, f/k/a Tri-Command Managing Member, LLC, a/f/k/a Tri-Command Military Housing, LLC, and Atlantic Marine Corps Communities Property Management LLC, (collectively "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      This is an action for personal injury, property damage, breach of contract, and abuse of the landlord-tenant relationship in the context of military housing.  Plaintiffs' claims arise from the Defendants' negligent maintenance and upkeep of military housing including, but not limited to, water intrusion, water damage, and related mold and mycotoxin proliferation at 69 Beech

Street, Beaufort, South Carolina, 29906, in the "Laurel Bay" housing neighborhood which is adjacent to Marine Corps Air Station Beaufort ("MCAS Beaufort").

2. This action is commenced against the owner/landlord entity, Atlantic Marine Corps Communities, LLC, a private-public partnership managed and controlled by Lendlease (US) Public Partnerships, LLC, which had the non-delegable duty for managing and maintaining the military houses at Laurel Bay, and AMCC Property Management, LLC, the designated property manager, which likewise had a duty to manage and maintain military houses for servicemember families including Plaintiffs.

3. Defendants promised quality housing in exchange for the Plaintiffs' rent payments which, in the military, are paid in the form of Base Allowance Housing ("BAH") but that instead, Defendants provided substandard housing, negligently remediated the problems with the housing, and that the deleterious effects of these problems physically harmed the Skeans', mainly M.S. who is a young child.

4. Defendants knew, or should have known, that various housing defects at 69 Beech Street posed potential health hazards yet they failed to warn Plaintiffs about the danger. This, together with other aggravating factors, supports punitive damages against Defendants.

5. Despite the foregoing, Defendants, and other military housing companies, argue that modern landlord and tenant laws related to the habitability of housing do not apply to injured victims of defective military housing. Instead, they say, the "federal enclave doctrine" leaves injury law frozen in time despite the clear intentions of all those involved.

6. According to Defendants, Laurel Bay and other military housing areas are essentially sanctuaries for obsolete restrictions of the common law and graveyards for the burial of every humane legislation passed for the benefit of landlords and their tenants. Yet no

compelling reason exists to deny military tenants and their families the application of modern landlord and tenant laws.

7.    As then-Congressman James Buchanan observed in 1823, federal enclaves represent a "palpable defect in our system" because "a great variety of actions, to which a high degree of moral guild is attached, and which are punished…at the common law…by every State…may be committed with impunity [within enclaves.]"  According to Defendants, it is today with Laurel Bay and other *privatized* housing areas.

## PARTIES AND JURISDICTION

8.    Plaintiffs are residents and citizens of the State of South Carolina with a principal place of residence located in Beaufort, South Carolina.  Plaintiffs previously leased the home located 69 Beech Street in the Laurel Bay housing area ("Laurel Bay") at Marine Corps Air Station Beaufort ("MCAS"). [1]

9.    Defendant Atlantic Marine Corps Communities, LLC, d/b/a Atlantic Marine Corps Communities at Tri-Command, f/k/a Tri-Command Military Housing, LLC ("AMCC") is and has been at all relevant times a Delaware limited liability company authorized to do business in and doing business in South Carolina.

10.    Tri-Command Managing Member, LLC and Tri-Command Military Housing LLC were Delaware limited liability companies and were the corporate predecessors of AMCC.  Tri-Command Managing Member, LLC and Tri-Command Military Housing LLC were merged out of existence and became AMCC.

11.    Defendant AMCC Property Management, LLC ("AMCC PM") is and has been at all relevant times a Delaware limited liability company authorized to do business in and doing

---

[1] Defendants previously assigned new residential addresses to hundreds of homes at Laurel Bay which, without knowing the "old" addresses, makes it extremely challenging to search for records related to the homes.

business in South Carolina. AMCC PM acts as AMCC's agent for the lease of residential housing to military families at various locations, including Laurel Bay, during all relevant times and is authorized to manage residential housing at Laurel Bay on AMCC's behalf.

12.     Tri-Command Property Management LLC was a Delaware limited liability company and was the corporate predecessor of AMCC PM. Tri-Command Property Management LLC was merged out of existence and became AMCC PM.

13.     AMCC and AMCC PM are joint tortfeasors, agents of the other, joint venturers, and/or engaged in the joint enterprise of leasing military housing at Laurel Bay, as well as the conduct and acts alleged herein.

14.     Plaintiffs' claims arise out of or related to activities that Defendants directed in the State of South Carolina.

15.     The federal government authorized Defendants to build and maintain rental housing for military personnel and their families at Laurel Bay. Upon information and belief, Defendants were instructed and/or required by the government to maintain the housing in safe and habitable condition.

16.     Defendants are not persons or entities acting under a federal officer so as to give rise to a defense of qualified immunity, nor are Defendants subject to any sovereign immunity, derivative sovereign immunity, governmental immunity, or government contract defense, primarily because Defendants did not follow the government's explicit instructions and/or requirements as more fully detailed herein below.

17.     This Court has personal jurisdiction over Defendants because of their contacts with the State of South Carolina, the fact that Defendants build, own and manage hundreds of military

houses at Laurel Bay in Beaufort, South Carolina, and the fact that they derive substantial revenue from managing military housing in South Carolina.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this district.

## FACTS

### A. Background of the Military Housing Privatization Initiative ("MHPI")

19.     Plaintiffs reiterate and reallege the preceding paragraphs as if fully set forth herein.

20.     In response to poor housing conditions existing on military bases across the country, Congress enacted the Military Housing Privatization Initiative (the "Privatization Initiative"), Defense Authorization Act, P.L. 104-106, 110 Stat. 186. The Privatization Initiative is a public/private program that, among other things, seeks "to stimulate private sector financing of military housing construction and revitalization projects," S. Rep. No. 104-112, §§ 2811 pp. 329 (1995), and "substantially upgrade military housing on an accelerated basis."

21.     To accomplish this the Privatization Initiative utilizes new "authorities" that permit the military to offer cost-saving and money-earning benefits to private entities as a *quid pro quo* for their provision of base housing and related services to military personnel. *See* 141 Cong. Rec. S18853 (1995) (The Privatization Initiative provides "new authorities for the provision of new housing, repaired housing, [and] restored housing for our military personnel"). Under the Privatization Initiative, the private commercial entity developer will "own, operate and maintain the houses, and lease the underlying land from the agency for a term of fifty years." Stacie A. Remy Vest, *Military Housing Privatization Initiative: A Guidance Document for Wading Through the Legal Morass*, 53 A.F. Rev. 1, 24 (2002) (internal citations omitted).

22.     This initiative allowed the Department of the Navy ("Navy") and the other military branches to remove themselves from the distractions of day-to-day housing decisions and management and focus on their core mission of defending the United States.

23.     There are about 80 privatized projects encompassing more than 204,000 housing units located on more than 150 installations. The DoD considers these houses to be private housing. Service members who are housed on base are paid the prevailing BAH rate for their duty location and required to reimburse the management company of their rental home the full amount of their BAH. Before the advent of the MHPI, the home was provided in lieu of the BAH. This change creates continuous revenue flow for the life of the management contract and, conceptually, requires little additional funding from the government.

24.     Twenty years after privatization, in 2016, a DoD Inspector General Report found that poor maintenance and oversight left service families vulnerable to "pervasive" health and safety hazards. Specifically, on October 14, 2016, the DoD Office of Inspector General issued a report to "summarize and analyze previous DoD Office of Inspector General (DoD OIG) health and safety inspections of DoD-occupied facilities and military housing."  One "objective was to identify common issues and broader findings."

25.     The 2016 OIG Report summarized prior OIG reports and their findings of "critical deficiencies [which] included safety problems, such as … unmitigated mold growth in multiple buildings and family housing units."

26.     Beginning in 2018, Reuters published a series of award-winning news articles detailing substandard living conditions at U.S. military bases, including lead exposure, vermin infestation, mold and other contaminants. The reports described how military families encounter

high hurdles to resolving disputes in a system that grants vast power to private landlords who manage base housing across the United States.

**B. Defendants' Operation of Military Housing at Laurel Bay, Marine Corps Air Station Beaufort**

18.     Plaintiffs reiterate and realleges the preceding paragraphs as if fully set forth herein.

19.     Prior to the construction of the housing units at Laurel Bay in the late 1950's, the subject property was the location of the Tidewater Hospital, Busbee Pike Flying Service, Blue Channel Freezer Plant, Scott Crop Dusting Service and several plantations.  Julis A. and Rike K. White previously owned the largest portion of land, 960-acres, that now includes the majority of Laurel Bay.

20.     The Department of the Navy did not seek the consent of South Carolina to obtain the land where Laurel Bay is located.  Instead, the government obtained the property at Laurel Bay by condemnation of 752.54 acres, Civil Number 6107, on March 19, 1957. [2]

21.     To accomplish its goals related to the development and management of military housing at the Beaufort MCAS, the Department of the Navy ("DON") entered into a fifty-year lease agreement ("Ground Lease") with Tri Command Managing Member LLC ("TCMM") on March 1, 2003.

22.     Under the Ground Lease, the United States conveyed its rights and interests in the property which is the subject of this action to TCMM for fifty years and, further, conveyed title to all existing personal property (*e.g.,* equipment, appliances, furnishings, etc.) and title to the newly

---

[2] Unlike some military installations in South Carolina, Laurel Bay was not "ceded" to the federal government pursuant to S.C. Code Ann. §3-3-100 (1976, as amended).  There is no corresponding consent or cession from the State of South Carolina with respect to Laurel Bay.  Instead, the federal government took possession of the land as an ordinary proprietor via condemnation.

constructed units. TCMM, therefore, pursuant to the Ground Lease, obtained possession control over the renovation, demolition, construction and maintenance of the military housing for Beaufort MCAS, subject to requirements and duties imposed upon it by the Ground Lease and related documents.

23.     Prior to or concurrently with the execution of the Ground Lease, TCMM, as the managing member, and DON, as an equity investor only, formed a limited liability company called Tri-Command Military Housing ("TMH").

24.     As lessee under the Ground Lease, TCMM agreed to assign to TMH all of TCMM's leasehold interests, rights, title and obligations under the Ground Lease, and TMH agreed to assume all financial obligations of TCMM.

25.     Today, TCMM is known as "Atlantic Marine Corps Communities, LLC" ("AMCC"), and TMH is known as "AMCC Property Management, LLC" ("AMCC PM"). AMCC, as managing member of the Company, is responsible for the design, financing, demolition, renovation, ownership, management, operation and maintenance of existing and new housing units.

26.     Under the Ground Lease, the DON provides limited oversight in order to assure contract compliance. The property, therefore, is under the possession and control of AMCC PM and under the direction of AMCC, the managing member.

27.     In the Ground Lease, the Department of the Navy required, and Defendants' assignor agreed, to "observe and comply with, at its sole cost and expense, the provisions of all federal, state and local laws, rules, regulations, orders, ordinances, and other governmental standards and requirements which are applicable to the Premises, including . . . those provisions concerning the protection of the environment and pollution control and abatement and occupational safety and health,

whether such provisions are now in force or may, at any time in the future, be enacted or directed and, by law, become applicable to and enforceable against the Premises.

28.    The Ground Lease states, "[t]he Lessee shall obtain, to the extent required by Applicable Law, all federal, state and local permits and any other approvals required for the Development Management Obligations and at such time as any other future development occurs on the Premises."

29.    Further, the Ground Lease states, "To the extent the Premises are subject to state or local jurisdiction, at any time or times reasonably requested by the Lessee, the Government shall within fourteen (14) days following such request execute such applications for permits, licenses, vault rental agreements, and/or other permissions, authorizations, approvals and entitlements as are customarily sought or required from public authorities in connection with the development, design, demolition, construction, renovation, operation, management, use and maintenance of projects similar to the Development… ."

30.    Exhibit "A" to the Ground entitled, "Development Management Obligations", requires Defendants to obtain, as and when required, all required federal, state and local permits related to the development of the Construction Project, and any other approvals required for the construction, operation and management of the Construction Project; provided, however, that any necessary individual building permits, if required, for Housing Units will be secured as construction of the Construction Project proceeds and is completed, and certificates of occupancy ( or their equivalent), if required, will not be obtained until the Housing Units are placed into service."

31.    These actions were memorialized in the "Limited Liability Company Operating Agreement" ("Operating Agreement"). The Operating Agreement provides contextual information about the working relationship between Defendants and Navy and the role each plays in

implementing the Privatization Initiative under the Ground Lease at the Marine Corps Air Station Beaufort.

32.     Upon information and belief, the Operating Agreement requires AMCC PM to advise AMCC with respect to requirements for *full compliance with all building codes, zoning and licensing requirements*, and other laws, ordinances, regulations, orders and requirements of duly constituted federal, state and local governmental authorities having jurisdiction over the Project.

33.     Moreover, the Operating Agreement requires the Defendants to use its best efforts to obtain any and all licenses, certificates, permits or approvals that may be required by any governing military, *local, state*, or federal law, ordinances, rules and regulations to operate the Project.

34.     By executing the Ground Lease and Operating Agreement containing these requirements, the federal government clearly and unambiguously authorized South Carolina to enforce its State and local building codes and housing laws as they relate to the safety and habitability of housing.  Moreover, the federal government has not exercised its jurisdiction as to landlord-tenant laws at Laurel Bay (and other MHPI projects) because there is no federal common law that addresses these principles.

35.     For their part, Actus Lend Lease (the parent company to Defendant AMCC) commissioned URS Corporation to prepare a Final Phase I Environmental Site Assessment, Marine Corps Air Station, Laurel Bay, Beaufort, South Carolina, dated October 31, 2002 ("ESA").

36.     The ESA identifies various "environmental liabilities" associated with Laurel Bay including mold, asbestos, lead based paint, pesticides, and underground storage tanks that previously contained diesel fuel for heat production.

37.    According to the ESA, "evidence of past standing water (i.e., water marks on the wall and floor, mold growth, and rust) was observed in the furnace room, bathrooms, and laundry connections in the kitchen of some of the homes."

38.    The ESA references the "Report of Consultative Assistance Team (CAT) Visit to MCAS Beaufort, South Carolina, conducted by the Navy Environmental Health Center" dated September 7-8, 2000, which summarizes the results of an indoor air quality assessment (IAQ) performed at four homes at Laurel Bay.  As documented in the report, the study was performed to respond to a complaint where a resident reported to have had four episodes of pneumonia within a year.  An inspection of four homes at Laurel Bay identified various conditions that could promote mold growth including moisture accumulation due to HVAC condensation, exterior cracks and leaks and previously flooded carpets resulting from toilet water overflows, condensate water drain pan overflow, hot water heater and roof leaks. CAT collected air samples from the four homes and based on analytical results, concluded that the homes at Laurel Bay may have current or past indoor fungal growth.

39.    The ESA concludes, "Due to climatic conditions present in the region, the evidence of water damage observed during the site reconnaissance, and results of a previous assessment, the potential exists for mold to be present within the housing units of Laurel Bay.

40.    Based on the foregoing, when Defendants took control of military housing at Laurel Bay, they had long-standing notice that the leased houses, due to their age and state of disrepair, were prone to mold contamination as identified in the EBS, the ESA and other reports.

**C.    Form Leases at Laurel Bay**

41.    Plaintiffs reiterate and realleges the preceding paragraphs as if fully set forth herein.

42.     Plaintiff Shane Skeans executed a form lease ("Lease") for 69 Beech Street on June 8, 2021.  The initial one-year Lease term commenced on June 8, 2021, and ended on June 7, 2022. The Lease names AMCC as the "Owner" and AMCC PM as the property manager or "Agent" authorized to act on AMCC's behalf.  The Lease also describes AMCC as the "Landlord" and AMCC PM as the "Landlord Representative".

43.     Plaintiff Shane Skeans subsequently executed lease renewals and Plaintiffs eventually vacated 69 Beech in August 2023.  The terms of the lease renewals were identical to the original Lease.

44.     The Lease stated that AMCC, as the owner, was "responsible for maintenance and repair of the Premises, and for ensuring that the Premises are safe and habitable."  The Lease incorporated by reference a document called "the Community Guidelines and Policies" that specifies "additional Owner maintenance responsibilities."

45.     The Lease stated that Plaintiff could not make any repairs, alterations or improvements without Defendants' prior consent including small items such as paint, wallpaper, changing locks, using screws, fastening devices, large nails, or adhesive materials.  In this respect, Defendants maintained possession and control of the leased premises.

46.     The Community Guidelines and Policies document promised that AMCC would provide quality of life for service members and their families, assume responsibility for the military family Resident's housing and that AMCC PM staff would assist residents in every possible way to ensure superior quality housing services and amenities.  The Lease also contained a mold addendum promising that "Landlord will respond in accordance with the local, federal and state guidelines to repair or remedy."

47.     The foregoing terms represented a binding agreement whereby Defendants undertook the duty to make repairs at 69 Beech and to keep the home safe and habitable. Moreover, these same written terms formed an express warranty that Defendants would maintain the leased premises in a safe and habitable condition.

48.     According to the Lease, Plaintiffs and Defendants agree[d] that the Lease and the contractual relationship between the parties would be construed in accordance with and would be exclusively governed by the South Carolina Residential Landlord and Tenant Act ("SCRLTA") and South Carolina state common law that interprets the SCTLA.

49.     In South Carolina, the SCRLTA gives rise to a cause of action in tort.

50.     According to SCRLTA, S.C. Code Ann. §27-40-330, a residential lease agreement cannot make a tenant give up any legal rights or remedies under the South Carolina Landlord and Tenant Act or limit the landlord's liability when he or she has failed in his or her duties.

51.     As such, any language in the Lease that seeks to limit or eliminate Plaintiffs' rights and remedies under SCRLTA is void and unenforceable.

52.     Under the Lease terms and the SCRLTA, Defendants owed a duty to Plaintiffs to provide safe and habitable residential housing. Specifically, South Carolina Code of Laws §27-40-220 imposes upon landlords an obligation of good faith in the performance of their obligations under residential leases.

53.     Based on the plain language in the Lease and its incorporation of SCRLTA, the parties intended that South Carolina law would apply to Plaintiffs' claims. There are no circumstances indicating a different intention.

54.     On March 10, 2021, a joint hearing on privatized military housing was held before a subcommittee in the United States House of Representatives.  Carolyn Tregarthen, the Managing

Director of Communities for Lendlease, testified at the hearing.  When Congresswoman Jackie Speier asked, "Do each of you recognize your responsibility to comply with state and local laws concerning habitability of housing", Ms. Tregarthen responded, "Yes Congresswoman we do."[3]

55.     Despite Ms. Tregarthen's admission that state and local housing laws apply, Defendants (and other privatized housing companies) have repeatedly argued in Court, and continue to argue, that modern landlord and tenant laws concerning the habitability of housing, including the SCRLTA, do not apply to claims brought in tort by our nation's military heroes and their families.  Instead, Defendants argue that such claims are barred or severely limited by the Federal Enclave Doctrine.

56.     Ms. Tregarthen's testimony to Congress, along with the express language of the Ground Lease and residential Leases, shows that it was the parties' intent that state and local housing laws concerning the habitability of housing apply to Plaintiffs' claims.

57.     That despite Lendlease's representations to Congress, they now claim that M.S.'s claims for personal injury are barred by the Federal Enclave Doctrine to the extent that the claims are based on violation of South Carolina's modern landlord-tenant laws including SCRLTA.

58.     All notifications, statements, and representations made by Defendant AMCC PM to Plaintiffs were made under the within the course and scope of Defendant AMCC PM's agency with Defendant AMCC.

59.     Defendant AMCC PM drafts and controls the Community Policies and Guidelines provided to Laurel Bay residents and controls and directs virtually all representations to military families at Laurel Bay.

---

[3] See https://www.youtube.com/watch?v=VcBVr5pzZHU at time signature 46:10.

60.    Defendants had a pecuniary interest in leasing military housing to Plaintiffs at 69 Beech.

61.    Plaintiffs would not have entered into the Lease had Defendants disclosed material information about possible safety and health hazards at 69 Beech that Defendants knew or should have known.

**D.  The Skeans Family**

62.    Plaintiffs reiterate and reallege the preceding paragraphs as if fully set forth herein.

63.    Shane Skeans and Brittany Skeans are married and have three children.  While on active duty in the Marine Corps, Shane Skeans was an aviation microminiature solder and cable repair technician.  He achieved the rank of Staff Sergeant.

64.    M.S. was born on June 16, 2020.   Prior to moving into 69 Beech, M.S. had no major health problems or skin rashes.

65.    Prior to moving in, no significant deficiencies in the house were observed by Plaintiffs or reported by Defendants.  Plaintiffs were not warned or advised of any present or past history of mold or moisture conditions in the home.  Instead, Defendants warranted and represented to Plaintiffs that 69 Beech was safe and habitable.

66.    Plaintiffs relied on Defendants' representations as a basis for leasing the home.

67.    In view of the various reports, studies and documents in their possession, Defendants had longstanding knowledge of moisture-related defects in housing at Laurel Bay and negligently failed to warn Plaintiffs.

68.    Plaintiffs moved to 69 Beech Street on June 8, 2021, and almost immediately detected a foul smell in the home which was similar to a wet dog.  The interior of the home seemed unusually moist and humid. The floor would secrete a brown substance that looked similar to feces,

which Defendants dismissed as floor glue. The maintenance team members repeatedly stated that this was normal and posed no danger to us.

69.     Throughout Plaintiffs' tenancy at 69 Beech, the HVAC system repeatedly malfunctioned which caused water to accumulate in the system's drip pan.  Upon information and belief, the drip pan periodically overflowed into the surrounding walls and crevices.  Additionally, the HVAC's drain pump repeatedly failed causing water to accumulate and overflow.

70.     Plaintiffs submitted multiple work orders (approximately six) related to the defective HVAC system, but Defendants negligently failed to repair and/or replace the system as the Lease required. When the HVAC system would fail, the temperature in the home exceeded 80 degrees according to the thermostat.  Plaintiffs repeatedly requested that the Defendants replace the unit with a new and reliable system. The maintenance team ignored these requests and, instead, made band-aid fixes which made the moisture problem worse.  Despite repeated malfunctions, the workers stated that the unit would only be replaced if it completely stopped working and was no longer serviceable.

71.     In this respect, Defendants were on notice that serious moisture-related defects existed at 69 Beech.

72.     Defendants knew, or should have known, that the defective HVAC system was causing excess moisture to accumulate in the home and generate mold which posed a potential health hazard to the occupants.

73.     Unbeknownst to Plaintiffs, Defendants did not previously conduct a proper roof inspection, repair water leaks and/or cure moisture defects which caused moisture to accumulate within interior walls and generate mold.   For example, the flashing around the chimney was broken and not secured to the building which caused a water leak near the front entryway.

74.     Defendants had longstanding knowledge of moisture-related defects in other homes at Laurel Bay of similar construction and age, and that such homes including 69 Beech were prone to the accumulation of potentially toxic mold which posed a danger to occupants.  Nevertheless, Defendants actions did not cure the known defects.

75.     In the aforementioned regards, Defendants undertook to make the repairs as they repeatedly promised to do while Plaintiffs were tenants and injuries occurred on account of their negligence in so doing.

76.     Shortly after moving to 69 Beech, M.S. developed skin rashes which became progressively more severe.  Plaintiffs took M.S. to multiple doctors and dermatology specialists who prescribed medications and treatments which did not help.



77.     M.S. underwent allergy testing which showed that he is allergic to pet dander, certain foods and various strains of mold including aspergillus, pullilaria and stemphyllium.

78.     Plaintiffs followed their doctors' instructions and made substantial lifestyle changes.  They eliminated all foods from M.S.'s diet that caused allergic reactions and/or allergic sensitivity, evicted their family dog, and threw out many of their personal belongings including

clothing, furniture and other household items.  Plaintiffs repeatedly cleaned, scrubbed and attempted to disinfect 69 Beech hoping it would eliminate allergens.  Plaintiffs purchased an expensive air-purification system, installed upgraded air filters in their HVAC system and used anti-allergen/anti-mold laundry detergent on all clothing and bedding. In this respect, Plaintiffs eliminated other potential allergens as directed by their doctors.  Still, M.S.'s condition deteriorated further.



79.     M.S. developed impetigo; a secondary infection caused by scratching.  By then, Plaintiffs were unable to bathe M.S. because it caused him stinging pain.  Plaintiffs recall that M.S. would literally scream when placed in the bathtub and would avoid the bath/shower because he was afraid of it.  According to the doctors, there wasn't much that could be done until the infections cleared.  M.S. was prescribed strong antibiotics which caused a variety of unpleasant side effects including severe diarrhea.

80.     In view of the persistent HVAC defects, roof leaks and general disrepair of the house, and the elimination of other potential allergens in the home, Plaintiff suspected toxic mold

contamination and asked Defendants to conduct mold testing at 69 Beech.  In an email to Defendants dated April 30, 2023, Brittany Skeans informed Defendants that M.S. was severely allergic to mold and that the family had taken extreme measures to eliminate allergens in the home. Skeans described the overall poor condition of 69 Beech and described mold testing as the family's "last hope".  She included photos of M.S.'s severe rashes and allergy testing results.



81.    Defendants responded by sending two maintenance workers to inspect.  Upon information and belief, the maintenance workers had no formal training and were not qualified to conduct mold remediation.  These workers did not thoroughly inspect the interior walls, pull back carpets, or unhinge a baseboard to discover the true extent of mold contamination. Instead, they walked around the home with the use of their cell phone flashlight and determined there to be, "no signs or concerns of mold."  They told Plaintiffs, "You're good, but we will send someone to spray the mold that is there in the window seals."  The maintenance personnel that sprayed the mold cleaned the windows and a few other areas and left stating everything should be fine now.

82.    Defendants negligently failed to follow industry standards for mold testing and/or remediation. Rather than hiring competent and licensed remediation personnel or companies to investigate and/or remediate toxic mold, Defendants conducted hodge-podge repairs and negligently advised Plaintiffs that the home was safe and habitable.   In essence, Defendants made the problem worse by failing to properly remediate the mold and advising the parents that it was safe for M.S. to remain living there.

83.    During Spring 2023, M.S. was hospitalized on two separate occasions because his rashes and infections became so severe and unmanageable.

84.    Defendants took no further action to remediate mold at 69 Beech until a significant roof leak occurred in July 2023 which prompted Defendants to investigate the Skeans' concerns. This prompted maintenance workers to remove sheetrock from the walls.  The following photos show what they found:




85.    Despite the extensive black mold that was clearly visible inside the walls, Defendants still did not conduct scientific mold testing and/or relocate Plaintiffs until Shane Skeans requested that all occupants of 69 Beech be placed in temporary housing until the conclusion of the repairs.  Instead, Defendants continued to downplay the potential danger and naively informed Plaintiffs that there was no cause for concern.  Although the entirety of the cavity behind the affected wall, framework, and covered chimney were engulfed in black mold, the only material that was removed was the wet sheetrock.  The maintenance workers only sprayed a solution on the damp and mold-ridden wood, brick, mortar, and other areas in the visible work area and did not properly remediate the mold as they should have.

86.    Defendants did not properly seal off or properly contain the mold-infested areas. Instead, they merely taped and stapled plastic to the walls which, upon information and belief, did not protect Plaintiffs from further exposure to toxic mold.  Once again, Defendants made the problem worse than it started.



87.    In view of Defendants' refusal and failure to conduct professional mold testing and remediation, Plaintiffs retained a Certified Industrial Hygienist to conduct proper scientific mold testing at 69 Beech after the Defendants alleged that the problem was taken care of, and no further action was needed for the Skeans family and their children to move back into the home.  The testing indicated significant water damage in the floors and walls, along with *high* levels of toxic mold including aspergillus where M.S. breathed the air, played on the floor, and lived as an infant for over two years.



88.    Evidence shows that as a result of Defendant's negligent failure to maintain 69 Beech, M.S. was exposed to pervasive toxic mold and moisture-related defects which caused and/or exacerbated severe dermatological rashes, severe physical pain, hospitalization, emotional harm and other damages to be shown at trial.

## EXCESSIVE MOISTURE AND MOLD

89.    Plaintiffs reiterate and realleges the preceding paragraphs as if fully set forth herein.

90.    Upon information and belief, molds occur commonly, both in nature and in buildings and homes, and will grow anywhere indoors and outdoors where sufficient moisture is present. However, although molds and fungi may be present indoors, fungal growth and

amplification is not likely inside a dry, clean building. Excessive moisture conditions in water intruded damp indoor spaces results in the growth of particular molds which favor or utilize indoor building materials such as wood, dry wall, carpet materials and can grow to excessive indoor numbers. Many of these indoor growth molds have been identified and associated with serious human health effects, especially in persons with existing sensitivities, including M.S..

91.     Exposures to damp indoor spaces have long been known to be associated with and be a causative factor in a wide range of adverse health effects, including but not limited to certain allergies, asthma and other chronic respiratory conditions exactly as experienced here by M.S., and there is wide scientific and medical consensus on these effects, including that of the National Academies National Institute of Medicine, the Environmental Protection Agency ("EPA"), the U.S. Centers for Disease Control (CDC) and the World Health Organization.

92.     Mold and mold related products found in damp indoor spaces cause personal injury in several ways. Molds, mold products and MVOCs can cause direct "allergic" responses; these are often realized as upper respiratory conditions including, but not limited to, rhinitis, sinus infections, headaches, skin rashes and allergies. Molds and mold related byproducts found in damp indoor spaces can cause an "innate immune system" response, in which the body immune system reacts to the mold by forming a continued immune response which causes further harm on its own.

93.     In addition to the release of spores and mycotoxins, active fungal growth also produces MVOCs, which account for the musty or earthy odors often associated with excessive mold growths, and account for mold odors reported by the Plaintiffs in this case.  Mold exposures can cause serious respiratory and allergic effects, and elevated body sensitivities and allergic reactions from mold exposures can take months or years.  Fungal spores are naturally designed to become easily aerosolized by air movement or disturbance, and air ventilation systems are

common sources of wide dispersal. For these reasons, once visible molds are found or seen indoors all areas subject to contamination by mold or mold parts must be immediately sealed off and thoroughly cleaned using approved professional mold remediation standards.

94.     The most effective way to eliminate further mold growth and contaminate spread is to remove the mold from materials that can be cleaned and to discard materials that cannot be cleaned or are physically damaged beyond use. All sources of water and mold generation must be contained and eliminated. Mold spores are invisible to the naked eye; therefore, it is impossible to determine the contamination level of personal property by visible inspection and once a building has suffered significant mold contamination, all property inside the unit is considered contaminated.

95.     In this case, an inspection performed by Plaintiffs' certified mold investigator identified excessive mold growths and moisture inside the home, typical of a damp indoor space, both by sampling and visual observation. Specific mold species identified growing inside included mold types known to be associated with both damp indoor space environments and adverse human health concerns. The mold levels found inside the home by air samples were vastly higher than comparable outside levels, exceeded all bounds of sampling error, and were extremely dangerous to Plaintiffs, including M.S..

96.     The personal injuries sustained by M.S. in this case include allergic, immune and direct respiratory response consistent with established medical and scientific literature on exposure to damp indoor spaces and water damaged buildings.

97.     The potential for mold infestation and adverse human health effects in water intruded buildings was specifically addressed as early as 2001 by the U.S. Environmental Protection Agency in a special guidance entitled "Mold Remediation in Schools and Commercial

Buildings," and is applicable to the military housing at issue. Mold health effects and the relationship of mold growths to excess moisture have been reported and well documented in the published governmental medical, scientific and commercial literature for years prior to the occupancy of Plaintiffs in this case.

98.    The Defendants, as a large, national and international manager and owner of thousands of apartments and residential units knew full well of the health risks associated with water damaged buildings and mold. Defendants failed to remediate mold in Plaintiffs' home in accordance with professional practices and caused serious injury and property loss to Plaintiffs as a result.

**FIRST CAUSE OF ACTION--NEGLIGENCE[4]**
**(All Defendants)**

99.    Plaintiff reiterates and realleges the preceding paragraphs as if fully set forth herein.

100.    By the express terms of the Lease, Defendants maintained the management and control over repairs at 69 Beech.  Because possession and control over repairs are reserved to Defendants, South Carolina law implies an obligation, creates a legal duty, to keep the leased premises in repair and operating properly.

101.    Even in the absence of the Lease, Defendants duty to M.S. existed independently based on the long-standing common law duty to exercise due care to foreseeable Plaintiffs.

102.    Defendants owed duties to M.S. as follows:

    a.  To maintain the leased premises at 69 Beech in good repair and operating properly;

---

[4] This first cause of action, negligence, is brought by Brittany Skeans, as mother and next friend of M.S., a minor.

b.  To comply with, and abide by, their own safety plans, safety procedures, and safety protocols for management of environmental hazards, including those identified in Defendants' Environmental Site Assessment and the Government's Environmental Baseline Survey;

c.  To inspect houses for suitability based on environmental, health, and safety considerations prior to leasing;

d.  To refrain from leasing houses that did not meet minimum adequacy standards for health and safety;

e.  To ensure that Plaintiff had quality housing generally reflecting contemporary community living standards;

f.  To undertake repairs, renovations, remediations and construction in compliance with local building codes and ordinances, and commensurate with industry standards;

g.  To refrain from leasing residential housing which Defendants knew or should have known would pose a health risk to residents;

h.  To keep the leased premises clean, safe, and habitable;

i.  To adhere to the terms of the Ground Lease;

j.  To adhere to the terms of the Lease;

k.  To comply with applicable federal, state, and local laws regarding the safety and habitability of the leased premises including, without limitation, the SCRLTA;

l.  To comply with the International Property Maintenance Code, as adopted in Beaufort as the Property Maintenance Code of the City of Beaufort ("PM Code"), Code of Ordinances for Beaufort South Carolina, Section 5-1017, which imposed

upon Defendants the following specific duties: (1) To maintain buildings, structures, and premises; (2)To refrain from "permit[ting] another person to occupy premises that are not in a sanitary and safe condition and that do not comply with the requirements of [the PM Code]."

m. To exercise reasonable care for the safety of M.S.;

n. To comply with their safety plans, safety protocols, and safety procedures that required putting residents on notice of potentially harmful conditions and related health risks they may encounter at 69 Beech;

o. To communicate truthful information to residents about the homes in Laurel Bay, including 69 Beech, including a duty to disclose material facts regarding the premises of which Defendants had knowledge, as to which Plaintiffs lacked knowledge, of which Plaintiffs ought reasonably to be informed before entering into the Leases, and nondisclosure of which would render Defendants' other representations regarding the safety and habitability of the Premises misleading;

p. To check moisture levels in the home, especially given Defendants' repeated failure to properly repair the HVAC system, and disclose moisture-related hazards to Plaintiffs;

q. To properly complete repairs to the HVAC system and related moisture intrusion at 69 Beech as required by the lease and once undertaken by Defendants;

r. To properly investigate and remediate mold at 69 Beech as required by the lease especially once mold was identified by Defendants' maintenance workers;

103.    Defendants breached their duties to M.S. in one or more of the following particulars:

a.  Failing to comply with, and abide by, their own safety plans, safety procedures, and safety protocols for management of environmental hazards, including those identified in Defendants' Environmental Site Assessment and the Government's Environmental Baseline Survey;

b.  Failing to inspect houses for suitability based on environmental, health, and safety considerations prior to leasing;

c.  Failing to refrain from leasing houses that did not meet minimum adequacy standards for health and safety;

d.  Failing to ensure that Plaintiff had quality housing generally reflecting contemporary community living standards;

e.  Failing to undertake repairs, renovations, remediations and construction in compliance with local building codes and ordinances, and commensurate with industry standards;

f.  Failing to refrain from leasing residential housing which Defendants knew or should have known would pose a health risk to residents;

g.  Failing to keep the leased premises clean, safe, and habitable;

h.  Failing to adhere to the terms of the Ground Lease;

i.  Failing to adhere to the terms of the Lease;

j.  Failing to comply with applicable federal, state, and local laws regarding the safety and habitability of the leased premises including, without limitation, the SCRLTA;

k.  Failing to comply with the International Property Maintenance Code, as adopted in Beaufort as the Property Maintenance Code of the City of Beaufort ("PM Code"), Code of Ordinances for Beaufort South Carolina, Section 5-1017, which imposed

upon Defendants the following specific duties: (1) To maintain buildings, structures, and premises; (2)To refrain from "permit[ting] another person to occupy premises that are not in a sanitary and safe condition and that do not comply with the requirements of [the PM Code]."

l.   Failing to exercise reasonable care for the safety of M.S.;

m.  Failing to comply with their safety plans, safety protocols, and safety procedures that required putting residents on notice of potentially harmful conditions and related health risks they may encounter at 69 Beech;

n.   Failing to communicate truthful information to residents about the homes in Laurel Bay, including 69 Beech, including a duty to disclose material facts regarding the premises of which Defendants had knowledge, as to which Plaintiffs lacked knowledge, of which Plaintiffs ought reasonably to be informed before entering into the Leases, and nondisclosure of which would render Defendants' other representations regarding the safety and habitability of the Premises misleading;

o.   Failing to check moisture levels in the home, especially given Defendants' repeated failure to properly repair the HVAC system, and disclose moisture-related hazards to Plaintiffs;

p.   By covenanting to keep the premises safe and habitable during the lease term and failing to do so;

q.   By undertaking to make needed repairs and doing so negligently, including repairs to the HVAC system, water leaks and moisture-related defects at 69 Beech;

r.   Failing to properly investigate and remediate mold at 69 Beech as required by the lease especially once mold was identified by Defendants' maintenance workers;

104.    Defendants' breaches of duties as aforesaid constitute negligence, negligence *per se*, recklessness, and gross negligence.

105.    As a proximate and legal result of Defendants' negligence, negligence *per se*, recklessness, and gross negligence, M.S. incurred actual damages in the form of physical injuries including, but not limited to, severe exacerbation of pre-existing dermatological conditions, and other special damages in an amount to be proven at trial.

106.    As a proximate and legal result of Defendants' negligence, negligence *per se*, recklessness, and gross negligence, M.S. is entitled to an award of all his actual and consequential damages, in amounts to be proven at time of trial.

107.    Defendants' conduct was undertaken grossly negligently and with reckless disregard for the foreseeable consequences to M.S..

108.    Defendants' conduct therefore justifies an award of exemplary or punitive damages.

## SECOND CAUSE OF ACTION-VIOLATION OF SOUTH CAROLINA RESIDENTIAL LANDLORD TENANT ACT[5]
### (All Defendants)

109.    Plaintiffs reiterate and realleges the preceding paragraphs as if fully set forth herein.

110.    The Lease incorporates by reference the terms of the SCRLTA.

111.    Under the Lease and the SCRLTA, Defendants owe a duty to Plaintiff to provide safe and habitable residential housing.

112.    Specifically, South Carolina Code of Laws §27-40-220 imposes upon landlords an obligation of good faith in the performance of their obligations under residential leases.

---

[5] This second cause of action, violation of SCRLTA, is brought by both Plaintiffs.

113.    Also, South Carolina Code of Laws §27-40-440(a) obligates Defendants to supply housing that complies with all applicable building and housing laws materially affecting health and safety and to keep the Premises in a fit and habitable condition.

114.    The SCRLTA was enacted to provide for safe and habitable housing, including compliance with the requirements applicable building and housing codes materially affecting health and safety, and to promote public safety.

115.    Defendants have mandatory statutory duties to tenants under SCRLTA to do whatever is necessary to put and keep and do whatever is necessary to put and keep the premises in a fit and habitable condition.

116.    Plaintiffs are tenants in leased houses subject to the provisions of SCRLTA, and a within the class of persons to be protected by application of SCRTLA.

117.    The SCRLTA explicitly creates an action in tort for Defendants' failure to repair a leased premises after having notice of a defect.

118.    Under the terms of the Residential Leases, Plaintiffs agreed to pay rent in exchange for safe and habitable residential housing.

119.    Defendants breached their duty to provide safe and habitable residential housing.

120.    Despite their mandatory duties per the Residential Leases and the SCRLTA, Defendants failed to provide healthy, safe, fit, and habitable housing to Plaintiffs. Instead, Defendants exposed Plaintiffs to known environmental contamination, mainly toxic mold, and related health risks without their knowledge and against their will.

121.    Defendants therefore breached their duties under the Leases and the SCRLTA and Plaintiffs are entitled to all rights and remedies afforded to tenants under the SCRLTA, which includes a recovery for their reasonable attorney's fees and costs.

122.    Because of Defendants' breaches of their duties under the Residential Leases and the SCRLTA, it has been necessary for Plaintiffs to incur expenses and other special damages in an amount to be proven at trial.

123.    Plaintiff Shane Skeans has sustained damages as a result of Defendants' breaches of their duties under the Lease and the SCRLTA, which damages include the overpayment of rent.

124.    M.S., a minor, has sustained damages as a result of Defendants' breaches of their duties under the Lease and the SCRLTA, which damages include severe personal injury, pain & suffering, emotional distress and other damages to M.S. as fully detailed herein above.

125.    As a proximate and legal result of Defendants' breaches of their duties, Plaintiffs are entitled to an award of all their actual and consequential damages including, but not limited to, attorneys' fees and costs, in amounts to be proven at time of trial.

### THIRD CAUSE OF ACTION-BREACH OF CONTRACT[6]
**(All Defendants)**

126.    Plaintiffs reiterate and realleges the preceding paragraphs as if fully set forth herein.

127.    Plaintiff entered a valid contract in the form of a residential lease with Defendant.

128.    Under the Lease, Defendants assumed responsibility to meet the housing needs of Plaintiff; this included a duty to disclose the existence of environmental contamination and potential health hazards of which Defendants had actual or constructive knowledge and duties under the South Carolina Residential Landlord Tenant Act (S.C. Code Ann. §§27-40-10 through 27-40-940) (the "SCRLTA") to "make all repairs and do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition," to "keep all common areas of the premises in a reasonably safe condition," and to "maintain in reasonably good and safe working order and

---

[6] This third cause of action, breach of contract, is brought by Plaintiff Shane Skeans.

condition all electrical, gas, plumbing, sanitary, heating, ventilating, air conditioning, and other facilities and appliances, including elevators, supplied or required to be supplied by" Defendants.

129.    Under the terms of the Lease, Plaintiff agreed to pay rent equal to his BAH in exchange for safe and healthy residential housing for their families and agreed the parties' respective lease obligations and responsibilities would be construed under the SCRLTA and South Carolina common law interpreting these sections.

130.    Under the terms of the Lease and applicable laws, Defendants breached the Lease with Plaintiff.

131.    Specifically, Defendants failed to:

  a. Disclose to Plaintiff the nature and extent of environmental hazards identified in Defendant's Environmental Site Assessment and the Government's Environmental Baseline Survey;

  b. Warn Plaintiff about hidden defects on the Premises that could substantially interfere with safe enjoyment and use of the Premises;

  c. Comply with applicable provisions of internal policies and procedures regarding safety and habitability of housing at Laurel Bay;

  d. Comply with applicable provisions of federal, state, and local laws that established a standard of care with respect to safety and habitability of housing at Laurel Bay (as set forth further herein);

  e. Comply with the express terms of the Lease which require Defendants to make proper repairs to the premises;

  f. Comply with the terms and requirements of the Community Guidelines which require Defendant to provide safe and habitable housing;

g.  Comply with applicable provisions of the SCRLTA; and

h.  Provide safe and habitable housing to Plaintiff;

i.  Other breaches to be shown in Court.

132.    Plaintiff sustained damages as a result of Defendants' breaches including the overpayment of rent.

133.    Because of Defendants' breaches of contract, it has been necessary for Plaintiff to incur expenses and other special damages in an amount to be proven at trial.

134.    Under the terms of the Lease, Plaintiff is entitled as the prevailing party to recover reasonable attorneys' fees and costs in pursuing this action.

135.    As a proximate and legal result of Defendants' breaches of contract, Plaintiff is entitled to an award of all his actual and consequential damages including, but not limited to, attorneys' fees and costs, in amounts to be proven at time of trial.

**WHEREFORE,** Plaintiffs pray for judgment in their favor against Defendants as follows:

1.  General, special, and consequential damages in an amount to be proven at trial;

2.  Reasonable attorneys, fees and costs;

3.  Punitive damages for Defendants' reckless and grossly negligent conduct; and

4.  For such other and further relief as the Court may deem just and proper.


BAUER & METRO, PC

s/   Robert S. Metro
Robert S. Metro (#12680)
Rob@bauermetro.com
Post Office Box 7965
Hilton Head, SC 29938
(843) 842-5297

*ATTORNEY FOR PLAINTIFFS*

May 13, 2024
Bluffton, SC